FILED
2017 Mar-29 PM 12:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LARRY WARDLOW, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case Number: 2:15-cv-00367-JHE |
| ) | |
| MICHAEL WHITEN, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**MEMORANDUM OPINION**[1]

Plaintiff Larry Wardlow ("Wardlow") initiated this action against Officer Michael Whiten alleging federal claims pursuant to 42 U.S.C. § 1983 for excessive force, unlawful arrest, and malicious prosecution and state law claims for assault and battery and malicious prosecution. (Doc. 1). Wardlow amended his complaint to include allegations against Birmingham Chief of Police A.C. Roper in all but the state law assault and battery claim.[2] (Doc. 3). Defendants now move for summary judgment. (Doc. 35). The motion is fully briefed and ripe for review. (Docs. 36, 37, & 38). For the reasons stated below, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

**I. Standard of Review**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 21).

[2] Plaintiff also asserted a negligent security claim against Black Market Bar and Grill in his Amended Complaint. Because that claim did not relate back to his original complaint and was thus outside the statute of limitations, the Court dismissed that claim on October 28, 2015. (Doc. 28).

the pleadings, the discovery, and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a Court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. V. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911

F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts[3]

Michael Whiten ("Whiten") has been an officer with the Birmingham Police Department for eighteen years. (Doc. 35-1 at 4, 21). He has been arrested once, for assault and harassment following a bar fight with a former coworker, Chris Johnson, who had started dating Whiten's ex-girlfriend. (*Id.* at 21). Whiten was put on administrative duty. (*Id.*). Several months later, Johnson approached Whiten in a parking lot and they exchanged words. (*Id.*). After the conversation in the parking lot, Johnson filed harassment charges against Whiten. (*Id.*). Whiten was found guilty after a trial and placed on administrative duty for approximately sixteen months; the charges against him were nolle prossed after he attended counseling sessions. (*Id.* at 23, 43-44).

In 2013, Whiten also worked security for Black Market Bar and Grill ("Black Market"), a private business, every other Friday evening. (*Id.* at 4-6). On Friday, March 1, 2013, Whiten worked his usual shift, from 8:30 a.m. to 5:00 p.m., in the detective bureau at the police department. (*Id.* at 6). He then went home until he had to start his security shift at Black Market at approximately 9:00 or 10:00 p.m. (*Id.* at 6-7). Once at Black Market, per his usual routine, Whiten poured himself a soda and stood at the end of the bar. (*Id.* at 7). Approximately forty-five minutes after he arrived, Whiten first saw Wardlow sitting a few barstools down from where he was standing. (*Id.*). To his knowledge, Whiten had not met Wardlow before that evening. (*Id.* at 20).

The same day, Wardlow returned home from a trucking job and did some chores. (Doc. 36-3 at 7). At approximately 10:15 p.m., Wardlow walked a few blocks from his apartment to Black Market, where he had never been. (*Id.* at 7, 16). He took a seat near the end of the bar and,

---

[3] The following facts are undisputed or, if disputed, taken in a light most favorable to Wardlow, the nonmoving party. Where Defendants dispute a fact or set of facts, that dispute is addressed in a footnote.

3

after ordering a beer, he introduced himself and made small talk with the people sitting around him. (*Id.* at 7-8).

After periodically making eye contact with him, Wardlow asked if Whiten was drinking while on duty. (Doc. 35-1 at 8; doc. 36-3 at 8). Wardlow believed Whiten was drinking alcohol, and Whiten never told Wardlow he was not drinking. (Doc. 36-3 at 8).[4] Whiten grew angry that Wardlow had inquired about his drinking and responded that he could have Wardlow arrested for whatever he wanted. (*Id.*). Sensing possible tension, Wardlow excused himself to the restroom for a few minutes before returning to his seat, hoping things with Whiten had cooled. (*Id.* at 10).[5]

When Wardlow returned to his seat from the restroom, Whiten walked out of the bar on his phone, and Wardlow thought he was leaving for the evening. (Doc. 36-3 at 11). Whiten returned a few minutes later with a blonde woman. (*Id.*). The blonde woman sat down beside Wardlow, who said hello to her. (*Id.*). At that point, Whiten "blew up" at Wardlow and made physical contact with him, causing Wardlow's face to hit the bar. (*Id.*). Wardlow did not remember leaving the bar or fighting Whiten, but the two somehow ended up outside, where Whiten picked up Wardlow, tackled him, and hit him in the face two or three times. (Doc. 36-1 at 8; doc. 36-3 at 12).[6]

---

[4] Whiten testified he tipped his cup and responded that he was drinking soda. (Doc. 35-1 at 8).

[5] According to Whiten, Wardlow told Whiten that he did not want to spend the evening sitting next to a policeman. (Doc. 35-1 at 8). Whiten felt that Wardlow was possibly trying to provoke him, so Whiten moved to the opposite corner of the bar. (*Id.*).

[6] Whiten's account of the encounter described in this paragraph differs significantly from Wardlow's. According to Whiten, he did not return to the end of the bar until approximately one hour later. (Doc. 35-1 at 8). Wardlow again made eye contact and said something to him, but Whiten could not hear what he said because the bar was so loud by that point. (*Id.*). Wardlow continued speaking to him, so Whiten went over to the bar stool to ask what Wardlow's problem was. (*Id.*). Wardlow told Whiten that he was the problem. (*Id.*). Whiten then told Wardlow he had enough and should probably leave for the night. (*Id.*). After Wardlow got his jacket, Whiten escorted him to the door; after Wardlow exited, Whiten heard a commotion at the front door. (*Id.*).

Wardlow remembered waking up in a CT scan machine, but he did not remember going to the hospital. (Doc. 36-3 at 12).[7] When he woke up and started moving, the nurse told him to remain still because they were scanning his fractured eye socket. (*Id.*). Wardlow could recalled speaking to the blonde woman and having his face smashed into the bar, which made him upset; he then got up, hobbled out of the room, and shouted at Whiten, demanding to know why Whiten had attacked him. (*Id.* at 14.). When Wardlow told Whiten he would be in trouble for attacking him when others saw the security footage, Whiten laughed and told him that the bar only had security videos at the front door, so the video did not get anything on him. (*Id.*). Whiten attempted to escort Wardlow back into the hospital room but both men "stuck [their] hands out," after which Whiten tripped Wardlow and handcuffed him. (Doc. 36-3 at 15).[8]

---

Wardlow screamed at the bouncers and at Whiten, shouting at Whiten that he would wait on the sidewalk and would get him when his shift ended. (*Id.* at 9). After a few minutes of this behavior, Whiten walked outside to place Wardlow under arrest; he grabbed Wardlow by the left bicep and then Wardlow grabbed Whiten's throat with his right hand. (*Id.*). Whiten immediately let go of Wardlow's arm, at which point Wardlow used both arms to put Whiten in a headlock. (*Id.*). Whiten grabbed Wardlow's legs and tackled him to the ground; Whiten landed on top of him and struck him in the face maybe two or three times. (*Id.*). When Wardlow was still, Whiten rolled him over onto his stomach and handcuffed him. (*Id.*) Whiten then called for backup and for medics to examine Wardlow's bloody nose. (*Id.* at 10).

[7] According to Whiten, he and his backup patrolmen stood Wardlow up and Wardlow was able to walk to the squad car on his own. (Doc. 35-1 at 10). The medics examined him and asked Whiten to take him to the hospital, which is police department policy. (*Id.*). The officers took Wardlow to UAB Hospital in the back of the patrol vehicle. (*Id.*). When they arrived at the emergency room, the nurse walked them straight into a room; Whiten removed Wardlow's handcuffs at the nurse's request so he could be treated. (*Id.* at 16-17). Whiten waited outside the room while Wardlow was treated and given a CT scan, because Wardlow was still upset and was calmer when Whiten was not in the room. (*Id.*). While he waited, Whiten began making his report, notifying his supervisor, and getting together the use of force documentation. (*Id.* at 17). When Wardlow came out of his room, he screamed at Whiten and asked if Whiten was responsible for injuring his face. (*Id.* at 18).

[8] Whiten testified Wardlow attempted to tackle him but could not. Whiten wrestled him to the ground in front of the nurse station and laid on top of him until UAB officers, who were stationed in the emergency room, arrived and helped Whiten get Wardlow back into handcuffs. (Doc. 35-1 at 18-19).

5

Whiten left the hospital at approximately 6:00 a.m., after another officer came to take Wardlow to jail. (Doc. 35-1 at 18; doc. 36-3 at 16). Wardlow remained in jail for about one day. (Doc. 36-3 at 17). Wardlow ultimately pleaded guilty to police harassment for the incident in the hospital. (Doc. 36-3 at 16-17; doc. 36-6).

### III. Analysis

#### A. Municipal Liability – Count A

Defendants argue the City, through Chief Roper in his official capacity as Chief of Police, cannot be held liable under Count A, Wardlow's § 1983 claim for unreasonable or excessive force. (Doc. 35 at 7). "[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978). This means that, "to impose liability on a municipality under § 1983[, a plaintiff must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403 (1997). Municipal liability arises only if the municipality maintains an unconstitutional policy or custom. *See Monell*, 436 U.S. at 690-91.

Failure to train can qualify as a municipal policy if "the need for more or different training [is] so obvious, and the inadequacy so likely to result in the violation of constitutional rights" and "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 390 (1989). In other words, "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Bryan County*, 520 U.S. at 407. Moreover, "municipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations." *City of Canton*, 489 U.S. at 397 (O'Connor, J., concurring in part and

dissenting in part).

As of March 1, 2013, the date of the incident, the City of Birmingham Police Department had specific rules governing the use of force, reporting use of force, investigations into uses of force, and how to execute a custodial arrest. (Doc. 35-1 at 124-28). According to Chief Roper, recruits at the Police Academy receive over 800 hours of training (double the amount required by the Alabama Police Officer Standards and Training Commission); specifically, they are trained on federal and state criminal laws, how to conduct lawful investigations and arrests, and on the City's policy regarding use of force. (*Id.*). Throughout an officer's career, that training is supplemented regularly. (*Id.*). Additionally, Chief Roper averred that all complaints of officer mistreatment are investigated by the Internal Affairs Division and, if mistreatment is proven, the offending officer is appropriately disciplined. (*Id.*).

Officer Whiten has been with the City of Birmingham Police Department for approximately fifteen years. He did not have a history of widespread abuse. According to Internal Affairs logs, Whiten was involved in six instances where force was indicated between January 2007 and February 2012. (Doc. 54-7 at 10, 18, 22, 24, 28, & 46). The evidence indicates that Whiten has had one citizen complaint for use of force, for which he was placed on suspension for three days. (Doc. 36-4). Wardlow points out that Whiten was not ordered to seek additional training on use of force at that time.

The police department had 2,449 reports of force used between January 2007 and February 2012; of those, seventy-two listed no finding (whether "in policy" or "sustained") and only one was "sustained," i.e. the excessive use of force allegation was supported by sufficient evidence. (*Id.*). In the *Blanchard* case, U.S. District Chief Judge Bowdre noted evidence had been presented that Chief Roper acknowledged in mid-2009 a general, department-wide need for officer training

7

and supervision on the use of force.  (Doc. 98 at 15, *Blanchard*). Unlike in *Blanchard*, however, Wardlow has not presented evidence that the City failed to follow its stated policies for training or investigating uses of force. Additionally, the City asserts (though without submitting substantiating evidence) that since 2012 the Police Department has made specific changes to its policy to correct and curtail the issues acknowledged by Chief Roper and Chief Judge Bowdre. (Doc. 37 at 6).

Wardlow points to two prior cases involving a Birmingham police officer's inappropriate use of force: *Blanchard v. City of Birmingham*, 2:10-CV-2250-KOB, and the beating of Anthony Warren.[9]  Courts in the Eleventh Circuit have determined that three prior incidents over a six year period,[10] four previous incidents,[11] four previous incidents in the last five years,[12] and six prior incidents[13] would be insufficient to constitute "notice" to the municipality of a need to train and supervise regarding the use of force.

Wardlow has only pointed to two cases involving the inappropriate use of force by a Birmingham police officer and thus has not submitted substantial evidence to demonstrate that the City's training or policies as to the use of force constitute deliberate indifference or that there was a pattern of constitutional violations.  Accordingly, Count A, Wardlow's § 1983 claim for excessive force against Chief Roper in his official capacity is due to be dismissed.[14]

---

[9] http://www.al.com/news/birmingham/index.ssf/2014/10/city_of_birmingham_approves_ca.html.

[10] *Mindler v. Clayton County*, 831 F.Supp. 856, 862 (N.D. Ga. 1993).

[11] *Gomez v. Metro Dade County,* 801 F.Supp. 674, 679-80 (S.D. Fla. 1992).

[12] *Ott v. City of Mobile,* 169 F.Supp.2d 1301, 1310-12 (S.D. Ala. 2001).

[13] *Owen v. City of Fort Lauderdale*, 174 F.Supp.2d 1282, 1295-97 (S.D. Fla. 2001).

[14] It is unclear from Whiten's amended complaint which of his claims are against Chief Roper in his official capacity and which are against Chief Roper in his individual capacity. (*See* doc. 3).  To the extent Whiten asserts the § 1983 claims in Counts C or D against Chief Roper in his official capacity, he has not alleged a policy or custom of the City of Birmingham has caused malicious prosecution or false imprisonment, merely that Chief Roper himself "has permitted and

### B. Whiten's Qualified Immunity – All Counts

Defendants argue the remaining claims (Counts A-E against Officer Whiten) are due to be dismissed because Officer Whiten is entitled to qualified immunity. (Doc. 35 at 19-26). Qualified immunity "shields public officials from suits against them in their individual capacities for torts committed while performing discretionary duties unless the tortious act violates a clearly established statutory or constitutional right." *Mahone v. Ben Hill County School Sys.*, 377 Fed. App'x 913, 915 (11th Cir. 2010).

To be entitled to qualified immunity, a defendant must first prove he was acting within the scope of his discretionary authority when the alleged wrongful conduct occurred. *Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994). At the time of the incident, Officer Whiten was working as a security guard for Black Market Bar and Grill, wore what appeared to Wardlow to be a police shirt, and acted like a police officer by patrolling the bar and investigating suspicious behavior. Though he may have been off-duty at the time, Whiten was engaged in carrying out his discretionary authority. *See, e.g., Bouye v. Marshall*, 102 F. Supp. 2d 1357, 1362 (N.D. Ga. 2000) (concluding a police officer working off-duty as an apartment complex security guard carried out discretionary duty when he looked like a police officer, displayed his badge, and patrolled the complex for suspicious behavior); *Traver v. Meshriy*, 627 F.2d 934, 937-38 (9th Cir. 1980) (concluding an off-duty police officer working as a security teller, with primary responsibility in the event of a crime to the police department rather than the bank, exercised discretionary duty when he detained a customer).

Once a defendant establishes he was acting within his discretionary authority, the burden

---

ratified a pattern and practice of misconduct," (*see id.* at ¶¶ 32 & 39), which is presumably an argument directed to Chief Roper's individual liability as a supervisor. *See Mathews v. Crosby,* 480 F.3d 1265, 1270 (11th Cir.2007) (discussing supervisory liability).

then shifts to the plaintiff to show that qualified immunity is not appropriate. *White v. City of Birmingham*, 96 F. Supp. 3d 1260, 1285 (N.D. Ala. 2015). Courts ask two questions to determine whether immunity is appropriate: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" (2) "If a violation could be made out on a favorable view of the parties' submissions, . . . [was] the right . . . clearly established?" *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). This two-part analysis may be performed in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

It is undisputed Wardlow has a right to be "free from excessive force in the course of an investigatory stop or other 'seizure' of the person." *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004). To establish an excessive force claim, a plaintiff must first show the government "seized" the plaintiff within the meaning of the Fourth Amendment. *See Beshers v. Harrison*, 495 F.3d 1260, 1265 (11th Cir. 2007). A Fourth Amendment seizure exists when "a governmental termination of freedom of movement [occurs] through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989).

If a plaintiff is seized, the court must determine "whether the force used to effectuate the seizure was reasonable." *Beshers*, 495 F.3d at 1266. "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Lee*, 284 F.3d at 1197 (internal quotation marks omitted). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Reasonableness cuts both ways, however . . . . [The court] cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most

favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011).

Wardlow and Whiten have very different descriptions of what happened the evening of March 1, 2013. Wardlow believes that Officer Whiten was drinking alcohol; he testifies that Whiten grew angry when Wardlow asked about the alcoholic beverage. Wardlow also testifies that Whiten tried to provoke him, commented that he could arrest Wardlow for whatever he wanted, and then blew up at Wardlow for talking to the blonde woman. Wardlow testified that Whiten grew so angry that he eventually confronted Wardlow and slammed his head into the bar, which essentially rendered Wardlow unconscious; the next thing Wardlow remembers after hitting his face on the bar was waking up in the hospital. However, according to Whiten, he had not been drinking that night, and Wardlow is the one who attempted to provoke him by stating that he did not want to sit at the bar next to a police officer all night. Whiten testified that Wardlow was acting strangely all evening and that he ultimately confronted Wardlow to ask what his problem was. When Wardlow responded that Whiten was his problem, Whiten escorted him to the door and told him he had had enough for that evening. According to Whiten, Wardlow was conscious, fighting back, hurling threats, and attempting to reenter the bar, at which point Whiten tackled him to the ground and hurt Wardlow's face. Although there may be video surveillance footage that would supposedly prove that Wardlow was conscious outside of the bar, that footage (whatever it may show) was not made part of this summary judgment record.

Based on the conflicting evidence of record, there are genuine issues of material fact that warrant jury consideration. Summary judgment on the issue of qualified immunity is not appropriate.

### C. Chief Roper's Qualified Immunity – All Counts

Defendants contend Chief Roper, in his individual capacity, is also entitled to qualified immunity on all counts, due to the fact he did not personally engage in the conduct alleged by Wardlow, nor was there evidence Chief Roper failed to train or supervise Whiten. (Doc. 35 at 25-26). Wardlow's response does not acknowledge or defend against this argument, and thus, to the extent the argument could be applicable, Wardlow's claims against Chief Roper in his individual capacity are abandoned and due to be dismissed. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (dismissing undefended claims on summary judgment); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."). Qualified immunity is not available as a defense to state law claims, however. *D'Aguanno v. Gallagher*, 50 F.3d 877, 879 (11th Cir. 1995). Therefore, qualified immunity cannot apply to Wardlow's state law malicious prosecution claim against Chief Roper in his individual capacity in Count E, and Chief Roper is not entitled to judgment as a matter of law on this ground.

### D. Whiten's State Agent Immunity – Counts B and E

Defendants also argue that Officer Whiten is entitled to summary judgment on the state law claims (Counts B and E) pursuant to Alabama's peace officer immunity doctrine. (Doc. 35 at 26-29). Alabama law provides law enforcement officers and their municipal employers with immunity from state law tort claims arising out of acts committed while these law enforcement officers are engaged in the performance of a discretionary function. Ala. Code § 6-5-338; *Ex parte*

*Cranman*, 792 So. 2d 392 (Ala. 2000) (setting forth the test for determining whether a state agent's conduct constitutes a "discretionary function" under § 6-5-338).

Wardlow does not dispute that Whiten was acting as a peace officer at the time of the incident. (Doc. 36 at 14). Therefore, the next questions are whether Whiten was performing discretionary functions at the time of the incident and whether he acted willfully, maliciously, or in bad faith. *Cranman*, 792 So. 2d at 405. For the same reasons stated above with respect to qualified immunity as to the federal § 1983 claims, there are genuine issues of material fact that warrant jury consideration. Summary judgment on the basis of state-agent immunity is inappropriate.

### E. Merits of Claims against Whiten – Counts B, C, and D

Defendants also argue that Whiten is entitled to summary judgment on the merits of the assault claim (Count B), the false imprisonment claim (Count C), and the malicious prosecution claim (Count D). To prove assault, a plaintiff must demonstrate that (1) the defendant touched the plaintiff, (2) the defendant intended to touch the plaintiff, and (3) the touching was committed in a harmful or offensive way. *Wood v. Cowart Enters.*, 809 So. 2d 835, 837 (Ala. Civ. App. 2001). To prove false imprisonment (an alternative claim to the malicious prosecution tort) a plaintiff must prove: (1) detention of a person, (2) the unlawful nature of the detention, and (3) damages; false imprisonment, however, does not require the element of malice or lack of probable cause. *De Armond v. Saunders*, 243 Ala. 263, 265 (1942). To succeed on a malicious prosecution claim, a plaintiff must prove: (1) institution of a prior judicial proceeding by the present defendant, (2) a lack of probable cause, (3) malice on the defendant's part, (4) termination of the prior proceeding in favor of the present plaintiff, and (5) damage. *Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 831-33 (Ala. 1999). Once again, as the material facts are genuinely disputed, summary judgment on

the merits is inappropriate.

### F. Punitive Damages

Defendants also seek summary judgment as to any claim Wardlow asserts for punitive damages against both Roper and Whiten. (Doc. 35 at 31). In support, they cite Alabama Code. § 6-11-26, which prohibits an award of punitive damages "against the State of Alabama or any county or municipality thereof, or any agency thereof[,]" and *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), which forbids punitive damages against a municipality under § 1983. Because Wardlow's claims against Roper in his official capacity are due to be dismissed, this argument is moot as applied to him in anything other than his individual capacity. However, Wardlow's claims against Whiten and against Chief Roper in his individual capacity are not claims against any of the entities identified in § 6-11-26, and nothing in *City of Newport* prohibits an award of punitive damages against a tortfeasor government official. *See City of Newport*, 453 U.S. at 267 ("Under ordinary principles of retribution it is the wrongdoer himself who is made to suffer for his unlawful conduct. *If a government official acts knowingly and maliciously to deprive others of their civil rights, he may become the appropriate object of the community's vindictive sentiments*. A municipality, however, can have no malice independent of the malice of its officials. Damages awarded for punitive purposes, therefore, are not sensibly assessed *against the governmental entity itself*.") (internal citations and emphasis omitted, emphasis added). If Wardlow is successful in his claims against Whiten and against Chief Roper in his individual capacity in Count E, neither Alabama Code § 6-11-26 nor *City of Newport* prevent him from receiving an award of punitive damages.

### IV. Conclusion

Based upon the foregoing, the defendants' motion for summary judgment is **GRANTED**

**IN PART** and **DENIED IN PART**.  There being no genuine issues of material fact as to the issue of municipal liability or qualified immunity as to Chief Roper, Chief Roper is entitled to summary judgment on all claims against him in his official capacity and on all claims against him in his individual capacity except Wardlow's state law malicious prosecution claim in Count E.  The remaining claims asserted against Whiten proceed because genuine issues of material fact preclude judgment as a matter of law.

DONE this 29th day of March, 2017.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE